# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
_____

Monica Michel,                                    Civ. No. 10-932 (DWF/JJK)

        Plaintiff,

v.

Michael J. Astrue                          **REPORT AND**
Commissioner of Social Security,           **RECOMMENDATION**

        Defendant.
_____

Gerald S. Weinrich, Esq., counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.
_____

JEFFREY J. KEYES, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g), Plaintiff Monica Michel seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability-insurance benefits.  The parties have filed cross-motions for summary judgment. (Doc. Nos. 7, 9).  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.  For the reasons stated below, this Court recommends that Plaintiff's motion for summary judgment be granted and Defendant's motion for summary judgment be denied.

**BACKGROUND**

**I.    Procedural History**

Plaintiff filed an application for disability-insurance benefits on March 21, 2008, alleging a disability-onset date of March 20, 2007. (Tr. 120-23.) The application was denied initially and on reconsideration. (Tr. 65-66.) Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on August 12, 2009. (Tr. 79-80, 22-54.) On September 3, 2009, the ALJ issued an unfavorable decision. (Tr. 1-16.) Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on January 28, 2010. (Tr. 17-21.) The ALJ's decision therefore became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. On March 24, 2010, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g). The parties thereafter filed cross-motions for summary judgment. *See* D. Minn. Loc. R. 7.2.

**II.    Factual Background and Medical History**

Plaintiff was born on October 4, 1973, and at the time of her alleged onset of disability on March 20, 2007, she was 33-years-old. Plaintiff completed two years of college. (Tr. 120, 150.) The vocational expert determined that Plaintiff has past relevant work as a hand packager at a medium, unskilled level; a cashier at a light, unskilled level; a nurse-assistant at a medium, semi-skilled level; a mail clerk at a light, unskilled level; and a cleaner at a medium, unskilled

level.  (Tr. 204.)  Plaintiff alleged she is precluded from working due to fibromyalgia, osteoarthritis, chronic fatigue, IBS, and neuropathy.  (Tr. 146.)

Plaintiff's medical problems began in March 2007, when she was evaluated for abdominal pain by Dr. Wei Ding at Mayo Clinic.  (Tr. 394-95.) Plaintiff reported having right upper-quadrant abdominal pain for two months. (Tr. 394.)  The pain usually started after eating, and it radiated up to the right shoulder or down to the right groin region.  (*Id.*)  The pain usually subsided after a few hours.  (*Id.*)  Plaintiff rated her pain at a level of four or five out of ten, but her examination was normal.  (*Id.*)  Dr. Ding ordered a number of lab tests, and they came back negative.  (Tr. 391, 395.)

On March 30, 2007, Plaintiff reported that her symptoms were increasingly frequent, lasting most of the day.  (Tr. 391.)  On examination, she exhibited mild tenderness on the right upper quadrant.  (Tr. 392.)  Dr. D.G. Bell, a Mayo Clinic physician, started Plaintiff on Vicodin, and ordered a CT scan of her abdomen. (Tr. 392-93.)  The scan was normal.  On April 3, 2007, Plaintiff reported getting moderate relief from Vicodin.  (Tr. 388.)  Dr. Bell ordered x-rays of Plaintiff's thoracic and lumbar spine, and further GI consultation.  (Tr. 389.)

On April 5, 2007, Plaintiff saw Dr. Vandana Nehra in Gastroenterology and Hepatology.  (Tr. 386-87.)  Her examination was normal with the exception of tenderness in the right lower flank and right lower, mid and upper quadrants. (Tr. 386.)  Dr. Nehra ordered a small bowel follow-through, but noted that Plaintiff's presentation was suggestive of musculoskeletal pain.  (Tr. 387.)

Plaintiff returned to see Dr. Bell on April 10, 2007. (Tr. 383-85.) She reported new symptoms over the last few days including flushing and paresthesias over the right side of her face extending down her neck and into her right shoulder and upper-right chest, a weak right upper extremity, intermittent crampy and burning pain in the right quadrant, which frequently radiated into the right thigh, and burning pain on the bottom of both feet. (Tr. 383-84.) Plaintiff reported that her right flank pain occasionally radiated into her thigh, calf, and ankle. (Tr. 384.) Vicodin had reduced her pain to a level of five out of ten. (*Id.*) But she had not been able to work. (*Id.*) Plaintiff appeared slightly distressed and had some tenderness on examination and slight weakness in the upper and lower extremities. (Tr. 385.) Dr. Bell ordered a neurology consultation. (*Id.*)

The next day, Plaintiff underwent a work-status evaluation with Dr. Patricia Barrier. (Tr. 381.) Plaintiff reported she could not drive due to right-sided numbness, paresthesias, and pain. (*Id.*) Dr. Barrier noted that Plaintiff seemed very distressed and disabled at that time. (*Id.*) She recommended that Plaintiff not return to her housekeeping duties until her situation was better defined and treated. (*Id.*)

On April 12, 2007, Plaintiff underwent a neurologic evaluation by Dr. Orhun Kantarci. (Tr. 376-78.) Plaintiff reported additional symptoms of finger and arm tingling and paresthesias on the right side. (Tr. 376.) Her neurological examination was normal, but Plaintiff exhibited significant pain behaviors, which improved somewhat when she relaxed. (Tr. *377.*) She had a few tender spots

compatible with trigger points, but they were localized to the right side and were not replicable in every spot.  (*Id.*)  Dr. Kantarci ordered an EMG, a sweat test, and MRIs of the cervical and thoracic cord.  (*Id.*)  He noted that it could well be myofascial pain syndrome.  (Tr. 378.)

Plaintiff's sweat test produced mild findings, indicating that small fiber neuropathy could not be ruled out, but Dr. Kantarci did not feel it explained Plaintiff's symptoms.  (Tr. 373, 375.)  The EMG and MRIs of Plaintiff's spine were negative.  (Tr. 373.)  Dr. Kantarci ordered an MRI of Plaintiff's head, a quantitative sensory exam, and autonomic testing to rule out small fiber neuropathy.  (*Id.*)  He also recommended treatment with Neurontin.  (Tr. 374.)

Plaintiff saw Dr. Bell again on April 24, 2007.  (Tr. 370-72.)  The MRI of her head was negative, but she had an incidental finding of cervical lymphadenopathy.  (Tr. 370.)  At that time, Plaintiff reported significant fatigue and sleep disruption.  (Tr. 371.)  Dr. Bell started Plaintiff on Neurontin with the goal of tapering Vicodin.  (Tr. 371-72.)  He ordered additional testing of inflammatory markers.  (*Id.*)

The next day, Plaintiff saw Dr. Newcomb and reported diffuse incapacitating pain in multiple joints, primarily the hands, wrists, hips, ankles and feet.  (Tr. 368.)  She also had right flank pain, nerve-type symptoms, cloudy-thinking, and paresthesias.  (*Id.*)  Plaintiff was sleeping only two hours a night.  (*Id.*)  It was very painful for her to walk, and she had a popping sensation in her skin.  (*Id.*)  She reported that she could not adequately care for her children and

asked her mother to come from Oregon to help her. (*Id.*) During this visit, Plaintiff appeared uncomfortable and tearful on examination. (Tr. 369.) Dr. Newcomb noted that she did not seem to be magnifying symptoms, and he did not see any indications that she was motivated by secondary gain. (*Id.*) Plaintiff walked very slowly and appeared to be in pain. (*Id.*)

Dr. Bell referred Plaintiff to the Mayo Clinic Fibromyalgia Treatment Program, where Plaintiff saw Nurse Kristine Zeitler and Dr. Terry Oh. (Tr. 365-67.) On April 30, 2007, Plaintiff described to Nurse Zeitler that she was having shooting pain in her feet, constant pain in her hips and legs, achy pain in her neck, shoulders and elbows, pressure pain in her face and jaw, and numbness in her face. (Tr. 365.) She rated her pain as ranging from seven or eight to beyond ten, on a scale of one to ten. (*Id.*) Plaintiff also reported symptoms of fatigue, poor sleep, TMJ, imbalance, sweating, night sweats, irritable bowel, irritable bladder, weight gain, headaches, numbness, tingling, joint swelling, stiffness, muscle spasms, restless legs, impaired mobility, cold intolerance, sensitivities, allergies, decreased concentration and cognition, mood swings, anxiety, crying, depression, irritability, and anhedonia. (Tr. 365.) Plaintiff reported that she was limited in housework, childcare, lifting, and socializing. (*Id.*)

On examination, Plaintiff displayed multiple pain behaviors, but her mental-status examination was normal. (Tr. 366.) All eighteen standard tender points of fibromyalgia were positive. (Tr. 367.) Nurse Zeitler noted that Plaintiff also had symptoms and findings that were not consistent with fibromyalgia. (*Id.*) She

recommended that Plaintiff participate in the Mayo Pain Rehabilitation Center. (*Id.*)

Plaintiff saw Dr. Bell again on May 7, 2007.  (Tr. 362-64.)  He noted that Plaintiff's rheumatological tests were normal.  (Tr. 362.)  Plaintiff reported some improvement in pain, from excruciating to moderate, and she was still sleeping poorly.  (Tr. 362-63.)  Dr. Bell increased Plaintiff's Neurontin and added Amitriptyline.  (Tr. 364.)  He agreed with Dr. Oh's recommendations for physical therapy and a TENS unit.  (*Id.*)

Plaintiff began physical therapy on May 11, 2007.  (Tr. 360-61.)  She reported that she had the most pain in her feet, but also had pain in her hands, arms, and neck.  (Tr. 360.)  She was fatigued and had difficulty getting out of bed.  (*Id.*)  She walked with an antalgic gait and a limp.  (*Id.*)  Her strength and reflexes were normal, and she was hypersensitive to pinprick on her hands and feet.  (*Id.*)  Plaintiff was given a prescription for a front-wheeled walker.  (*Id.*)

On May 16, 2007, Plaintiff saw Dr. Bell and reported slight improvement, especially with her sleep, but she felt somewhat of a hangover from Amitriptyline. (Tr. 357-58.)  Plaintiff remained off work, and her mother was in town helping her. (*Id.*)  In physical therapy that day, Plaintiff's pain level was down to six out of ten. (Tr. 356.)  Plaintiff started a trial of a TENS unit for her feet.  (*Id.*)  However, her pain returned at a level of ten out of ten several days later.  (Tr. 355.)

Plaintiff saw Dr. Newcomb on May 25, 2007, and explained that her pain was highest in the morning, and it gradually improved and then worsened again

in the afternoon.  (Tr. 353.)  She did not feel Neurontin was helping, and Amitriptyline made her feel so sedated that she could tolerate only a small dose. (*Id.*)  The TENS unit helped her back and hips but it made her feet swell if she used it on her legs.  (*Id.*)  On examination, Plaintiff moved very slowly and exhibited pain behaviors.  (*Id.*)  Dr. Newcomb opined that she should stay off work until she became more mobile.  (Tr. 354.)

On June 1, 2007, Plaintiff went to physical therapy and stated that her pain was 30% improved.  (Tr. 352.)  Her gait was improved, but she still used a walker at home.  (*Id.*)  Plaintiff complained of her hands, feet, and lymph nodes swelling. (*Id.*)

Plaintiff next saw Dr. Oh on June 26, 2007, and reported being frustrated with her persistent symptoms of pain, numbness, fatigue, headaches, and irritable bowel.  (Tr. 349.)  Dr. Oh stated, "I saw her on April 30 of this year . . . when I could not diagnose her with fibromyalgia since she had the pain only two months.  She continues to have diffuse body pain and has 18/18 tender points and multiple fibromyalgia-associated symptoms.  Now I can diagnose her with fibromyalgia."  (Tr.  350-51.)  He recommended that she participate in a pain-rehabilitation program.  (Tr. 351.)

Plaintiff was not doing much better when she saw Dr. Bell on July 3, 2007.  (Tr. 345-47.)  However, Dr. Bell noted that she was walking better since he last saw her, and she was sleeping in three-hour stretches rather than just

minutes. (Tr. 345.) Dr. Bell increased Plaintiff's medications and noted that she would begin a three-week pain program on September 19. (Tr. 346-47.)

Several weeks later, Plaintiff told Dr. Newcomb that when she got up in the morning, she felt weighted down at the hips and neck and had trouble getting out of bed. (Tr. 343.) She felt creaks and pops throughout her body, with diffuse muscle and joint aches. (*Id.*) Neurontin was not helping, and it was making her mentally foggy. (*Id.*) She tried to be as active as possible, and she walked one or two blocks with her daughter. (*Id.*) She wanted to return to work but did not feel capable of making important decisions. (*Id.*) She also felt she would need to be moving around rather than staying in one position for long. (*Id.*) Plaintiff asked whether she could wait until after her participation in the pain program to resume limited work activities. (Tr. 344.) On examination, Plaintiff appeared uncomfortable and her gait was stiff and wide. (*Id.*) Dr. Newcomb noted that Plaintiff's joint aches were not consistent with fibromyalgia, and he questioned the possibility of mixed connective tissue disease. (*Id.*) He advised Plaintiff that he would return her to limited work activities after her participation in the pain program. (*Id.*)

Several days later, Plaintiff saw Dr. Bell and described improvement in her sleep and the pain in the bottoms of her feet. (Tr. 340.) She continued to have diffuse muscle and joint pain, most prominent in her knees and feet. (*Id.*) Dr. Bell noted that Dr. Newcomb questioned whether Plaintiff's symptoms were

fully explained by fibromyalgia, and he referred Plaintiff to rheumatology to evaluate for connective tissue disease.  (Tr. 342.)

Plaintiff attended a rheumatology consultation with Dr. Shreyasee Amin on July 27, 2007.  (Tr. 337-39.)  Plaintiff's examination was normal with the exception of diffuse tenderness with multiple fibromyalgia tender points. (Tr. 338-39.)  Dr. Amin found no objective evidence of inflammatory arthritis or connective tissue disorder.  (Tr. 339.)  She ordered some lab work, but noted if it came back unremarkable, Plaintiff might benefit from the pain program.  (*Id.*)

On September 19, 2007, Plaintiff was admitted to the Pain Rehabilitation Center at Mayo Clinic.  (Tr. 324.)  Her medications at that time included Neurontin, Amitriptyline, Albuterol inhaler, Tylenol Arthritis, and Tylenol P.M.  (*Id.*) Plaintiff was seen by CNS Joan Cronin.  (Tr. 322-23.)  Ms. Cronin noted Plaintiff's pain began in March 2007.  (Tr. 322.)  Plaintiff had constant but variable intensity knee pain, foot pain, and jaw pain.  (*Id.*)  Plaintiff's pain level that day was eight on a scale of one to ten.  (*Id.*)  Plaintiff reported that she could walk for eighty minutes and sit for fifteen minutes.  (*Id.*)  On examination, Plaintiff's posture was normal.  (Tr. 323.)  She did not exhibit any pain behaviors. (*Id.*)  A physical-therapy plan was created for Plaintiff.  (*Id.*)

The next day, Dr. W. Hooten noted that Plaintiff reported ongoing diffuse pain consistent with fibromyalgia.  (Tr. 312.)  She had been unable to work at her job as a housekeeper since May 2007, and she was spending the majority of her time in sedentary activities.  (*Id.*)  She also had depressive symptoms.  (*Id.*)

Plaintiff's mental-status examination was normal. (Tr. 313.) Dr. Hooten diagnosed her with fibromyalgia. (*Id.*)

Then, RN Susan Vale interviewed Plaintiff. (Tr. 310-11.) Nurse Vale reported that Plaintiff was divorced and had three children, aged 17, 14 and 11. (Tr. 310.) Her hobbies were walking, reading, and sewing, and she could participate "some" in these activities. (Tr. 310-11.) Her last job was in housekeeping at Mayo Clinic. (Tr. 310.) She had not worked since her pain started in March, but she hoped to return to work. (*Id.*)

Nurse Vale and Dr. Hooten completed a pain-rehabilitation-treatment plan for Plaintiff. (Tr. 314-19.) Plaintiff's chronic generalized pain would be addressed in terms of her decreased activities of daily living; physical deconditioning; mood changes and medication management. (*Id.*)

On October 1, 2007, Plaintiff underwent a psychological assessment with Dr. Barbara Bruce at Mayo Clinic. (Tr. 272-74.) Plaintiff was administered an IQ test, but a formal measurement indicated a lack of effort, making the results invalid. (Tr. 273.) Plaintiff scored high on a depression scale and on the Pain Catastrophizing Scale. (*Id.*) She was diagnosed with major depression, recurrent, severe; and fibromyalgia. (Tr. 274.)

Plaintiff underwent another psychological assessment on October 4, 2007, this time with Dr. Daniel Rohe at Mayo Clinic. (Tr. 265-67.) Plaintiff was given a number of tests related to her vocational interests and aptitude. (Tr. 265-66.) Dr. Rohe stated:

> In summary, this is a very caring individual who works hard on others' behalf, particularly her children and those in need. She has worked exceedingly hard for the past 20 years raising her children and striving to better herself. She deserves all the support the clinic can supply her. Repeat assessment of her cognitive abilities is worthy of consideration since she believes these scores are below what might be expected in light of the fact that she was on significant medications at that time.

(Tr. 266.)

Dr. Hooten wrote a dismissal summary when Plaintiff completed the pain-rehabilitation program at Mayo on October 11, 2007. (Tr. 252-55.) He reported on Plaintiff's progress in her activities of daily living. (Tr. 252-53.) She demonstrated a significant decline in pain behaviors, and decreased preoccupation with symptoms. (Tr. 252.) During her participation in the program, Plaintiff reported that her pain was on average at a level of seven out of ten, and her mood was on average six out of ten, with ten being the best mood. (Tr. 253.) Despite her pain, she demonstrated the ability to attend eight hours of daily programming. (*Id.*) Plaintiff also made progress in the area of physical deconditioning. (*Id.*) She noted significant improvement in endurance, strength, flexibility, and overall aerobic conditioning. (*Id.*) She planned to continue a daily exercise routine at home. (*Id.*)

In the area of medication and mood management, Plaintiff tapered off Amitriptyline, Tylenol Arthritis, Tylenol P.M., and began tapering Neurontin. (Tr. 253.) She attended daily groups on stress management, relaxation, anger management, self-esteem, anxiety, and communication skills. (*Id.*) Her family

was very supportive of her efforts.  (*Id.*)  On discharge, Plaintiff's mental-status

examination was normal.  (Tr. 254.)  Plaintiff was encouraged to attend Pain

Rehabilitation Center aftercare.  (*Id.*)

Plaintiff also met with her occupational therapist upon discharge from the

program.  (Tr. 248-49.)  The following recommendations were made for Plaintiff

to attain her goals of returning to work, volunteering, and managing her home:

gradual return to volunteer work; exploration of employment; proper posture and

body positioning; ergonomically correct workstation; use relaxation principles;

take frequent stretch breaks and changes in position; incorporate moderation,

modification, energy conservation, time management and proper body

mechanics into activities of daily living.  (Tr. 248.)

Upon discharge from physical therapy, Physical Therapist Joshua Larson

noted that Plaintiff met her short term goals in strength and aerobic conditioning.

(Tr. 245.)  Plaintiff was given a home exercise program and equipment to work

on her long term goals.  (*Id.*)

Plaintiff saw her primary care provider, Dr. Richard Newcomb, on October

23, 2007.  (Tr. 243-44.)  Plaintiff reported making progress in her activity levels

and wanted to try to return to work.  (Tr. 243.)  Plaintiff had persistent problems

with her neck and shoulder, and she questioned whether her right shoulder pain

was from fibromyalgia, because she noticed popping and clicking with limited

range of motion.  (*Id.*)  Dr. Newcomb doubted Plaintiff would be able to return to

housekeeping or custodial work, but he wanted her to try a gradual return to work

with restricted activities, starting with two- to four-hour shifts as tolerated.
(Tr. 244.)  Plaintiff expressed concern about tolerating work every day, but
Dr. Newcomb wanted her to try it first and reduce to every other day if necessary.
(*Id.*)

Dr. Newcomb referred Plaintiff to Dr. Thomas Osborn in the
Musculoskeletal Clinic for evaluation of her right shoulder pain.  (Tr. 241-42.)  On
physical examination, Plaintiff had normal abduction and rotation, with pain on
the extremes.  (Tr. 241.)  Her pain was diffuse and occurred with any kind of
movement.  (*Id.*)  X-rays indicated widening of the joint space and possible
spurring and slight subluxation of the clavicle on the right.  (*Id.*)  Dr. Osborn
diagnosed acromioclavicular arthritis of the right shoulder.  (*Id.*)  He
recommended a corticosteroid injection.  (*Id.*)

Plaintiff saw Dr. Newcomb again on November 30, 2007.  (Tr. 239.)
Plaintiff was taking Lyrica but had not noticed any improvement, so Dr. Newcomb
increased her dose.  (*Id.*)  When Plaintiff returned two weeks later, she had
started working two-hour shifts Monday through Friday.  (Tr. 238.)  She reported
it was not going very well, because she was exhausted after her shift and had to
nap for three to five hours.  (*Id.*)  Plaintiff did not want to increase her dose of
Lyrica because she was having difficulty concentrating.  (*Id.*)  Dr. Newcomb
restricted Plaintiff to two-hour shifts every other day, with continued restrictions of
lifting ten pounds, avoiding bending, stooping, and repetitive or prolonged

reaching above shoulder level.  (*Id.*)  He restricted her to sitting or standing thirty minutes without a change in position.  (*Id.*)

When Plaintiff saw Dr. Newcomb again in January 2008, she was out of Lyrica and her pain escalated significantly.  (Tr. 236.)  She was having difficulty paying for her medication.  (*Id.*)  She had not been working because there was not any temporary work for her.  (*Id.*)  However, she did not feel she could work because she was having difficulty getting up and moving around in the morning. (*Id.*)  Dr. Newcomb recommended a trial of acupuncture, and he took Plaintiff off work until her pain was under better control.  (*Id.*)  Approximately two weeks later, Plaintiff's pain had not improved and she was not sleeping well.  (Tr. 235.) Dr. Newcomb increased her Lyrica.  (*Id.*)

Plaintiff saw Dr. Newcomb again on February 26, 2008, and reported she was significantly worse the last several weeks.  (Tr. 233.)  She had increased swelling and pain, especially in her right shoulder and neck.  (*Id.*)  She was dizzy, light-headed, and had trouble concentrating and thinking.  (*Id.*)  Dr. Newcomb recommended that Plaintiff taper off Lyrica and try Neurontin again.  (*Id.*)  He took her off work for six weeks, and retested her inflammatory markers for lupus, rheumatoid factor, and any autoimmune symptoms.  (*Id.*)  Two days later, Plaintiff had acupuncture for her right shoulder pain.  (Tr. 232.)

On June 13, 2008, Dr. Sandra Eames, a state-agency consultant, completed a Physical RFC Assessment based on Plaintiff's medical records. (Tr. 433-40.)  She opined that Plaintiff could frequently lift twenty-five pounds,

occasionally lift fifty pounds, stand or walk six hours in an eight hour workday, sit six of eight hours in a workday, with limited ability to push and pull with her upper extremities, occasional overhead reaching, and no climbing ladders, ropes or scaffolds.  (*Id.*)

Six weeks later, Plaintiff saw Dr. Newcomb for a work-status evaluation.  (Tr. 498-99.)  Plaintiff's symptoms were pain in the ears, shoulders, and lower extremities, numbness and tingling in the extremities, dizziness, imbalance, depression, poor sleep, low energy, and trouble concentrating.  (Tr. 498.)  Plaintiff had recently moved from a home into a one bedroom apartment.  (*Id.*)  She had started smoking again.  (*Id.*)  Plaintiff appeared quite depressed, and Dr. Newcomb prescribed Prozac.  (Tr. 499.)  He also prescribed Wellbutrin for smoking cessation.  (*Id.*)  The next week, Plaintiff had acupuncture for pain treatment.  (Tr. 497.)

On August 5, 2008, Plaintiff attended a consultative psychological evaluation with Licensed Psychologist Debra Moran at the request of the Social Security Administration.  (Tr.  472-75.)  Plaintiff reported that she quit high school in tenth grade when she became pregnant.  (Tr. 472.)  She was able to get her G.E.D. and then complete a C.N.A. program.  (*Id.*)  She started nursing school six years ago, but did not finish the program.  (*Id.*)

Plaintiff explained that her pain began in March 2007, after she had been working many hours.  (Tr. 473.)  One day that month, her pain was so severe she could not get out of bed.  (*Id.*)  She developed a burning sensation in her feet.

(*Id.*)  She was never depressed or anxious before her fibromyalgia diagnosis.

(*Id.*)  Plaintiff reported the following symptoms:  sad mood, isolating behavior, loss of enjoyment, fatigue, sleep disturbance, feelings of worthlessness, difficulty in memory, difficulty concentrating, panic attacks, and fear of leaving her house. (*Id.*)  On a daily basis, Plaintiff tried to do small things for short periods of time with frequent breaks to lie down.  (Tr. 474.)  She made supper with her daughters and watched television or played a game with them in the evenings.  (*Id.*)  She no longer drove due to her symptoms.  (*Id.*)  She took a taxi to the grocery store and bought a few things every few days.  (*Id.*)

On mental-status examination, Plaintiff exhibited pain behaviors and appeared slightly depressed.  (*Id.*)  She had some word-finding difficulty and memory impairment.  (*Id.*)  Her mental status was otherwise normal.  (*Id.*) Ms. Moran diagnosed major depressive disorder, moderate and ruled out panic disorder.  (Tr. 475.) She opined that Plaintiff could adequately understand simple instructions and interact with others on a brief and superficial basis, but her ability to handle work stress may be limited by her psychological symptoms.  (*Id.*)

Plaintiff saw Dr. Newcomb again on August 15, 2008, and reported her mood had improved since starting Prozac and Wellbutrin, and she was able to quit smoking.  (Tr. 495-96.)  She was sleeping better but having more dizzy spells.  (Tr. 495.)  Plaintiff indicated she planned to visit her mother in Oregon and return to Minnesota in early October.  (Tr. 495-96.)  Dr. Newcomb stated, "she remains off work at this time and is fully disabled."  (Tr. 496.)  At that time,

Dr. Newcomb also completed a Fibromyalgia Questionnaire regarding Plaintiff. (Tr. 476-82.) He indicated that Plaintiff met the diagnostic criteria for fibromyalgia. (Tr. 476.) He stated Plaintiff was not a malingerer, but it was possible that emotional factors affected her pain. (Tr. 477.) He described Plaintiff's pain as daily, diffuse, and severe, with some changes from day to day, and her pain would frequently interfere with her concentration. (Tr. 477-78.) He opined that she would be incapable of handling even low stress. (Tr. 478.)

Dr. Newcomb opined that Plaintiff had the functional capacity to walk less than one block, sit thirty minutes at a time, stand fifteen minutes and would need to change positions frequently. (Tr. 479.) He opined that Plaintiff could sit, stand, or walk less than two hours in an eight hour workday, and she would need to change position at will. (Tr. 479.) He also opined that her impairments would cause her to miss more than four days of work per month. (Tr. 481.)

On August 18, 2008, state-agency consultant Dr. Ray Conroe completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment Form regarding Plaintiff. (Tr. 448-65.) He opined that Plaintiff had an affective disorder that caused mild restrictions in activities of daily living and in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 451, 458.) He opined that Plaintiff would be moderately impaired in the following activities: concentrate on, understand, and remember detailed instructions; carry out detailed tasks with

adequate persistence or pace; interact and get along with co-workers and the public; follow an ordinary routine, and handle work stress.  (Tr. 464.)

When Plaintiff returned to see Dr. Newcomb on October 29, 2008, she said her pain was somewhat worse.  (Tr. 493.)  She had felt better in Oregon where it was warmer, and she had a lot of help with her children while she was visiting her mother.  (*Id.*)  She planned to fly back to Minnesota, but was too anxious to fly, so her mother took four days to drive her back.  (*Id.*)  It was a shock to come back to the cold in Minnesota, and her joints and leg pain were worse.  (*Id.*)  Plaintiff was given a depression inventory, which indicated moderate depression.  (*Id.*)  She also reported that her dizziness was tolerable.  (*Id.*)

Dr. Newcomb noted that Plaintiff's pain had not changed, and he did not expect it to change.  (Tr. 494.)  He indicated that he would have her return once yearly to manage her disability.  (*Id.*)  Plaintiff reported she might move to Oregon to get assistance from her family in raising her children, and Dr. Newcomb indicated he would continue to see her once yearly after she moved.  (*Id.*)  He encouraged Plaintiff to see a psychologist to treat her depression.  (*Id.*)

On October 29, 2008, Plaintiff underwent an initial assessment at Associates in Psychiatry and Psychology.  (Tr. 511-15.)  Plaintiff indicated that she periodically abused alcohol.  (Tr. 512.)  She also reported that she was actually still married, but her husband had left.  (Tr. 513.)  Plaintiff's initial diagnosis was psychological factors affecting a physical condition and the doctor

ruled out dissociative disorder.  (Tr. 515.)  Her GAF score was 50, with a high score of 60 in the past year.  (*Id.*)

On mental-status examination approximately two weeks later, Plaintiff was depressed, with poor insight and judgment, low motivation, deficient orientation, and poor problem solving.  (Tr. 508.)  At her next session, Plaintiff disclosed details about being sexually abused beginning at age eight.  (Tr. 507.)  Therapist Bonita Patten diagnosed PTSD.  (*Id.*)

Plaintiff saw Dr. Bell on January 13, 2009, and rated her pain as ten out of ten.  (Tr. 487-90.)  Her pain was greatest in the right shoulder and radiating into the trapezius, right side of the face, and right upper biceps and triceps region.  (Tr. 488.)  On physical examination, Plaintiff appeared somewhat anxious.  (Tr. 489.)  Plaintiff had tenderness on the right shoulder and giveaway secondary to pain around the shoulder, but examination was otherwise normal.  (*Id.*)  Dr. Bell ordered x-rays of Plaintiff's shoulder and cervical spine.  (*Id.*)  He opined that due to the diffuse nature of her pain, Plaintiff should focus her treatment on pain rehabilitation and pain psychiatry.  (Tr. 489.)  Dr. Bell found some AC joint changes on x-ray but cautioned Plaintiff that it may explain only a limited component of her overall pain.  (Tr. 490.)

Dr. Bell referred Plaintiff to Dr. William Sisco in Orthopedic Surgery, where Plaintiff appeared nervous and anxious.  (Tr. 485.)  On physical examination, Dr. Sisco found that Plaintiff's shoulder range of motion was fairly good and her strength was adequate.  (*Id.*)  He recommended an MRI of Plaintiff's right

shoulder and an EMG to evaluate parasthesias in the upper extremity. (Tr. 486.)

Plaintiff elected not to do the MRI because she feared she would not tolerate it.

(Tr. 483.) The EMG was negative for neuropathy or radiculopathy. (*Id.*)

Dr. Sisco referred Plaintiff to rheumatology for evaluation of fibromyalgia. (*Id.*)

He also recommended an injection to the acromioclavicular joint, due to

degenerative changes. (*Id.*)

Plaintiff returned to counseling in April 2009, and she reported that she had

been crying, anxious, and felt terrified since January, after visiting her mother in

Oregon for Christmas. (Tr. 504.) Ms. Patten referred Plaintiff to Dr. Hart. (*Id.*)

This is the last medical record in the file.

## III.   Testimony at the Administrative Hearing

### Plaintiff's Testimony

At the August 12, 2009 hearing before the ALJ, Plaintiff testified that she

had moved to Oregon to live with her mother after being evicted from her

apartment in Minnesota in April 2009. (Tr. 26.) At the time of the hearing, she

was living with her two minor daughters, her mother, and step-father. (Tr. 27.)

Plaintiff's son was of age and lived on his own. (*Id.*) Plaintiff's only income was

from long-term disability from Mayo Clinic. (Tr. 28.) Plaintiff obtained her GED

after dropping out of high school, and she went to college for two years, but did

not obtain a degree. (Tr. 30.)

Plaintiff described her daily routine for the ALJ. (Tr. 31.) She does not get

out of bed until one in the afternoon because she is up and down all night. (*Id.*)

She can take care of her personal needs, but she no longer does any housework. (*Id.*) Before she moved to Oregon, she tried to cook and clean, but her daughters ended up doing most of the work. (Tr. 32.) She is too anxious to leave her mother's house. (*Id.*) She does not visit her relatives and does not have any hobbies. (Tr. 33.) She talks to her mother and daughters, watches television, and plays cards with them. (*Id.*) Before moving to Oregon, Plaintiff used public transportation to go out, but as her depression and panic attacks increased she went out less. (Tr. 33-34.) Plaintiff wanted to see a therapist in Oregon, but the closest provider her insurance would cover was 200 miles away. (Tr. 35.) She continued to take Prozac for depression, but it was not working. (*Id.*)

Plaintiff stated that the number one reason she could not work was pain throughout her body. (Tr. 37.) The second reason was her lack of concentration. (*Id.*) Plaintiff estimated that she could sit for thirty to forty minutes at a time, stand for fifteen minutes, walk five minutes, and lift one or two pounds. (Tr. 38-42.) She could bend occasionally but could never squat or climb stairs, and she could reach above shoulder level with her left arm. (Tr. 41-42.) Her pain was constant but varied in intensity from seven out of ten, to ten out of ten. (Tr. 42.) She used a TENS unit, which helped somewhat. (*Id.*) Neurontin and Prozac made her dizzy and tired. (Tr. 43-44.)

**Medical Expert Testimony**

Dr. Robert Beck testified at the hearing as a medical expert. (Tr. 44.)
Dr. Beck testified that Plaintiff did not meet or equal a Listing for any physical
impairment. (Tr. 44-45.) He opined that Plaintiff had the functional capacity to lift
twenty pounds occasionally, ten pounds frequently, stand two hours in a an
eight-hour day, and sit six hours in an eight-hour day. (Tr. 44-46.) He testified
that he disagreed with Dr. Newcomb's opinion of Plaintiff's more limited
functional abilities because all of Plaintiff's objective studies were normal with the
exception of her AC joint, which was not of major significance. (Tr. 47.)

**Vocational Expert Testimony**

Wayne Onken testified at the administrative hearing as a vocational expert.
(Tr. 48.) The ALJ asked Onken a hypothetical question regarding whether
someone of Plaintiff's age, education, and work history could perform Plaintiff's
past relevant work with the following impairments: fibromyalgia, degenerative
joint disease, and symptoms of total body pain, depression, fatigue, pain in the
feet, shoulders, and neck, difficulty concentrating, and dizziness; and with the
following functional capacity: can lift twenty pounds occasionally, ten pounds
frequently, sit six hours in an eight-hour day, and stand two hours in an eight-
hour day, allowing for a brief change of position, occasional overhead reaching
on the right, occasional climbing stairs, bending, and stooping, no balancing or
climbing ladders, conducting simple, routine work, with brief and superficial
contact with co-workers and the general public, with no high-production goals,

and no work around heights or dangerous moving machinery.  (Tr. 49.)  Onken

testified that such a person could perform Plaintiff's past work as a mail clerk and

a cashier.  (Tr. 50.)  However, Plaintiff testified that she never was a cashier.

(*Id.*)

Onken also testified that such a person could perform other jobs such as a

light, unskilled job as a routing clerk, of which there were 1,000 jobs in the State

of Minnesota.  (Tr. 50.)  He also recommended the job of mail sorter, which was

light, but was usually performed as sedentary.  (Tr. 51.)  The ALJ then asked

Onken to consider only sedentary jobs.  (*Id.*)  Onken testified that a light,

unskilled job of survey worker would fit the hypothetical, of which there were

1,500 positions in the State of Minnesota.  (*Id.*)  He also named two other

positions that fit the sedentary hypothetical:  unskilled surveillance system

monitor, of which there were 1,000 positions in the State of Minnesota, and

unskilled addresser, of which there were 1,000 positions in the State of

Minnesota.  (Tr. 51-52.)

Plaintiff's counsel then asked Onken whether a person who could not sit,

stand, or walk more than a total of two hours in an eight-hour workday could

perform any work.  (Tr. 52.)  Mr. Onken testified that such a person would be

presumptively disabled.  (Tr. 53.)  The ALJ noted that missing four days of work

per month would also be presumptive of disability.  (*Id.*)

## IV.    The ALJ's Findings and Decision

On September 3, 2009, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act from March 20, 2007, through the date of the decision, therefore denying Plaintiff's application for disability-insurance benefits.  (Tr. 1-16.)  The ALJ followed the five-step procedure set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4).  The Eighth Circuit Court of Appeals has summarized these steps as follows:  (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 20, 2007, therefore meeting the requirement at the first step of the disability-determination procedure.  (Tr. 6.)  At step two, the ALJ found that Plaintiff had the following severe impairments:

fibromyalgia, degenerative joint disease of the right AC joint, chronic fatigue, myofascial pain, and depression. (*Id.*)

At step three, the ALJ found that neither Plaintiff's physical nor mental impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 7-8). Specifically, the ALJ concluded that Plaintiff did not meet the "paragraph B" criteria for Listing 12.04, because Plaintiff's mental impairments did not result in at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation. (Tr. 7-8.) The ALJ found that Plaintiff's mental impairments resulted in only mild restrictions in activities of daily living, mild difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation. (Tr. 7.) The ALJ found no evidence of "paragraph C" criteria. (Tr. 8.)

The ALJ determined that Plaintiff had the RFC to perform the following:

[L]ight work as defined in 20 CFR 404.1567(b) as lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking 2 hours of an 8 hour day, and sitting 6 hours of an 8 hour day, brief changes of position, occasional overhead reaching, climbing of stairs, bending, and stooping, no climbing of ladders, work at unprotected heights or near dangerous moving machinery, and balancing, and limited to relatively simple, low stress work without high production goals and brief contacts with others.

(Tr. 8.) In reaching this RFC determination, the ALJ considered Plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of her symptoms, but found her not entirely credible. (Tr. 8-9.)

At step four of the disability-determination procedure, the ALJ found that Plaintiff was unable to perform her past relevant work.  (Tr. 15.)  However, at the fifth step of the procedure, the ALJ determined that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform including routine clerk, survey worker, surveillance systems monitor, and addresser. (Tr. 15-16.)  In coming to this conclusion, the ALJ relied on the testimony of the vocational expert.  (Tr. 16.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security Disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the

Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings. *Id.* In reviewing the administrative decision, "'[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial

evidence would support the opposite finding.)  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability-insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff alleges two errors in the ALJ's evaluation of her residual functional capacity.  First, she argues the ALJ erred in discounting her credibility based on the lack of objective findings in the record because fibromyalgia is diagnosed based on the lack of other explanation for the symptoms, and further, she argues that she met the diagnostic criteria for fibromyalgia.  Second, she contends the ALJ erred in rejecting the opinion of her treating physician, Dr. Newcomb.  The Court will address the latter argument first.

**Evaluating the Physicians' Opinions**

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)). "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician." *Lehnartz v. Barnhart*, 142 Fed. Appx. 939, 942 (8th Cir. 2005). If the treating physician's opinion is not given controlling weight, the ALJ should consider the following factors: examining relationship, treatment relationship, length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability of opinion, consistency of opinion with record as a whole, specialization, or any other factors that support or contradict the opinion. 20 C.F.R. § 404.1527(d).

In this case, the ALJ adopted the opinion of the testifying medical expert, Dr. Beck. The ALJ noted Dr. Beck's medical expertise and familiarity with the regulations, and that he had the opportunity to review the entire record and the "opinions of the claimant's treating sources that are supported by objective findings." (Tr. 13.) The ALJ gave less weight to Dr. Newcomb's opinion for the

following reasons:  Dr. Newcomb's work restrictions did not clearly correspond to objective physical findings; Plaintiff improved significantly in the pain rehabilitation program; after rehabilitation, there was "no clear increase in physical signs to substantiate her increased symptomatology and the serious restrictions imposed by Dr. Newcomb"; and Plaintiff did not regularly follow up with Dr. Newcomb after she planned to relocate to Oregon. (Tr. 14-15.)

Plaintiff asserts the ALJ erred by basing his decision on the lack of objective findings for Plaintiff's symptoms because the Eighth Circuit has recognized that the medical profession accepts a diagnosis of fibromyalgia based on:  1) identifiable trigger points on the body; 2) a physician's long-term assessment of symptoms and subjective complaints of the patient; and 3) objective testing that excludes other potential causes to explain the patient's symptoms.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 20 (citing *Brosnahan v. Barnhart*, 336 F.3d 671, 672-73 (8th Cir. 2003)).  Plaintiff points out that the fibromyalgia questionnaire Dr. Newcomb completed indicates that Plaintiff met the American College of Rheumatology criteria for fibromyalgia. Plaintiff also asserts that Dr. Newcomb's opinion that Plaintiff was incapable of even low-stress work and that her physical limitations were below even sedentary work were consistent with the assessment of virtually every other doctor at Mayo Clinic who evaluated or treated her.  Plaintiff states, "the ALJ could not point to any portion of Dr. Newcomb's opinions that were contradicted by any of the other physicians who had treated and seen [Plaintiff], or areas

where the described symptoms were inconsistent." (Pl.'s Mem. 22.) Plaintiff also states that she tried every type of treatment recommended to her.

Defendant contends that the ALJ's decision should be affirmed because Dr. Newcomb suggested that Plaintiff return to part-time work after she improved from her participation in a three-week pain-rehabilitation program. Defendant also asserts the ALJ is correct that there was nothing objective in Dr. Newcomb's notes, after he released Plaintiff to work, that would indicate a deterioration in her condition. In Reply, Plaintiff contends it is irrelevant that Dr. Newcomb made no objective findings of her deterioration after the time he released her for part-time work until the date he opined that she was disabled. She contends her attempt to return to work was a failure.

After review of the record, this Court concludes that the ALJ erred in not giving controlling weight to Dr. Newcomb's opinon.

> Fibromyalgia is a common nonarticular disorder of unknown cause characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissues. THE MERCK MANUAL 321 (18th ed. 2006). It can be exacerbated by environmental or emotional stress, poor sleep, trauma, or exposure to dampness or cold. *Id.* People with fibromyalgia tend to be "stressed, tensed, anxious, fatigued, striving, and sometimes depressed." *Id.*

*Barnes v. Astrue*, Civ. No. 07-2141, 2008 WL 5210753, at *2 (W.D. Ark. Dec. 10, 2008). "Fibromyalgia is an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are

entirely subjective." *Tilley v. Astrue*, 580 F.3d 675, 681 (8th Cir. 2009) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)).

Plaintiff's diagnosis of fibromyalgia was made after Plaintiff saw several specialists within Mayo Clinic over a period of four months to rule out other explanations for her chronic symptoms of diffuse pain, disturbed sleep, and fatigue. (*See* Tr. 350-51.) Upon examining Plaintiff, Dr. Oh, Nurse Zeitler, and Dr. Amin each individually noted that Plaintiff had the characteristic trigger points of fibromyalgia. Significantly, Dr. Newcomb, in his treatment notes and the fibromyalgia questionnaire, noted that he did not see any evidence that Plaintiff was magnifying her symptoms or was motivated by secondary gain. Plaintiff regularly exhibited pain behaviors on examination, and no physician suggested that she was magnifying symptoms. Nothing in the record points otherwise. Fibromyalgia causes diffuse pain and fatigue. Therefore, this Court concludes that the ALJ erred by rejecting Dr. Newcomb's opinion of Plaintiff's functional capacity due to a lack of objective findings to explain her pain and fatigue. However, a diagnosis of fibromyalgia is not "a free pass" under the social-security-disability laws. *Moraine v. Social Sec. Admin.*, 695 F.Supp.2d 925, 962 (D.Minn. 2010). The Court must determine whether there is substantial evidence showing Plaintiff's diagnosis of fibromyalgia does not fully explain her subjective complaints.

The ALJ is correct that Dr. Newcomb allowed Plaintiff to return to part-time work after she showed some improvement from participating in a three-week

intensive rehabilitation program. However, the ALJ did not consider that Dr. Newcomb soon placed more restrictions on Plaintiff's work activities, and when her pain and fatigue complaints continued, he opined that she was disabled from all work. *See Torgeson v. Unum Life Ins. Co. of Am.*, 466 F. Supp. 2d 1096, 1132 (N.D. Iowa 2006) (finding no evidence in record to support conclusion that Plaintiff was malingering or treating physician's restrictions were not justified). The ALJ's reliance on Plaintiff's improvement after her participation in a full-time rehabilitation program suggests he failed to appreciate that fibromyalgia is a chronic condition without a cure. *See Fisher v. Astrue*, Civil No. 08-5015, 2009 WL837653, at *4 (W.D. Ark. Mar. 26, 2009) (citing *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003)). Furthermore, Plaintiff's ability to perform in an intensive therapeutic environment does not establish her ability to work outside of that environment in full-time competitive employment. *See Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) ("[T]o find a claimant has the residual functional capacity to . . . work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.")

The ALJ also discounted Dr. Newcomb's opinion because Plaintiff did not continue to regularly treat with Dr. Newcomb after he found her to be completely disabled. However, the ALJ ignored several relevant facts. First, it was Dr. Newcomb's decision to see Plaintiff solely on an annual basis to manage her disability. Second, Plaintiff sought treatment from other doctors after

Dr. Newcomb determined that she was disabled.  Third, out of financial necessity, Plaintiff moved to Oregon in April 2009, to live with her family, and she had not yet found medical providers in Oregon.  For all of the reasons discussed above, this Court concludes that Dr. Newcomb's opinion on Plaintiff's physical residual functional capacity is consistent with the record as a whole.  Absent other reasons to discount Plaintiff's credibility as to her physical limitations, Dr. Newcomb's opinion regarding Plaintiff's physical residual functional capacity should have been granted controlling weight.[1]

The vocational expert testified that if he took into account Dr. Newcomb's opinion that Plaintiff could not sit, stand, or walk more than a total of two hours in an eight hour work day, she would not be able to perform any work.  (Tr. 52.) This opinion establishes Plaintiff's disability; therefore, further proceedings are unnecessary, and the case should be remanded for a calculation and award of benefits.  *See Jackson v. Bowen*, 873 F.2d 1111, 1115 (8th Cir. 1989) (holding remand was unnecessary where record supported a finding of disability).

---

[1]      The ALJ's reasons for rejecting Plaintiff's credibility are primarily related to Plaintiff's subjective complaints regarding her mental impairments and not her physical limitations.  This Court concludes that there are no credibility concerns regarding Plaintiff's physical limitations.  Therefore, Dr. Newcomb's opinion of Plaintiff's physical residual functional capacity is consistent with the record and should have been granted controlling weight.  Because this Court concludes that the ALJ erred in not giving Dr. Newcomb's opinion controlling weight, and Dr. Newcomb's opinion was not based on Plaintiff's mental impairments, this Court need not address Plaintiff's further arguments in relation to the ALJ's credibility determination based on Plaintiff's mental impairments.

# RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT**:

1.  Plaintiff's motion for summary judgment (Doc. No. 7), be **GRANTED**;

2.  Defendant's motion for summary judgment (Doc. No. 9), be **DENIED**;

3.  This case be remanded pursuant to sentence four of 42 U.S.C.

§ 405(g), for a calculation and award of benefits; and

4.  Judgment be entered.

Date: January 6, 2011          ___*s/ Jeffrey J. Keyes*_____
                               JEFFREY J. KEYES
                               United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**January 20, 2011**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  A judge shall
make a de novo determination of those portions to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable to the Court of Appeals.